**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **ERIC FLOYD,** | : | **CIVIL ACTION NO. 1:03-CV-1795** |
| | : | |
| **Plaintiff** | : | **(Judge Conner)** |
| | : | |
| **v.** | : | |
| | : | |
| **EDWARD J. KLEM, VINCENT F.** | : | |
| **MOONEY, and ABDEL HAMID** | : | |
| **HNESH,** | : | |
| | : | |
| **Defendants** | : | |

## MEMORANDUM

Presently before the court for judgment is the First Amendment retaliation claim of plaintiff Eric Floyd ("Floyd").  A non-jury trial was held.  Pursuant to Federal Rule of Civil Procedure 52, the court's findings of fact and conclusions of law are set forth below.

## I.   Findings of Fact

1.   Floyd is a Muslim of the sect of Salafism.  (Doc. 116 at 14.)

2.   Floyd was incarcerated in the State Correctional Institution at Mahanoy ("SCI-Mahanoy") from May 24, 1995 until his release from custody on November 5, 1999.  (Doc. 103 at 1.)  During his first period of incarceration at SCI-Mahanoy, Floyd attended religious services led by Imam Rasheed Salahuddin of the Germantown mosque and was provided access to a Salafi book and tape library. (Doc. 116 at 14.)  After his release from his first period of incarceration, Floyd worshiped at the Germantown mosque.  (Id. at 19.)

3.      Floyd returned to SCI-Mahanoy while serving a second sentence on August 9, 2002. (Doc. 103 at 1.)  During this second period of incarceration, Floyd attended religious services led by defendant Imam Abdel Hamid Hnesh ("Imam Hnesh"), who had been the Muslim chaplain at SCI-Mahanoy since February of 1999. (Doc. 116 at 150.)  Imam Hnesh was neither a member of the Germantown mosque nor a member of the sect of Salafism. (Id. at 16.)  Floyd testified that the Salafi book and tape library was not as extensive as it had been during his prior period of incarceration and that he discussed the lack of resources with Imam Hnesh. (Id. at 19-21.)

4.      On August 28, 2002, Floyd filed an inmate request slip that was addressed to Imam Hnesh. (Doc. 103 at 1-2.)[1]  The request slip states, in pertinent part, as follows:

---

[1] Floyd testified that in response to his inquiries about the lack of Salafi materials in SCI-Mahanoy, Imam Hnesh solicited request slips from any inmate who took issue with the focus of his materials or teachings. (Doc. 116 at 22-23.)  The court declines to credit this testimony.  Imam Hnesh testified that he returned from vacation to find that he had received numerous, unsolicited request slips and that he was "shocked and surprised" by this development. (Id. at 151.)  Imam Hnesh's account was confirmed by defendant Intelligence Captain Vincent Mooney, who testified that Imam Hnesh was "visibly upset" and "obviously shaken" when he received the request slips. (Id. at 166.)  The court finds that Imam Hnesh would not have exhibited such an emotional response had he sought out the request slips and, therefore, finds that the request slips were unsolicited by Imam Hnesh.

> [N]ow may Allah have mercy upon you that it is not from Islam to keep the people of the Da'wah as-Salafiyyah[2] from coming up to this jail and teaching Allah[']s religion to the people.  The way I see it is you allow the people who oppose the correct Da'wah to come and call to Ash-Shaytaan,[3] which we as the ummah[4] of this jail oppose you and the[ir] minhaj.[5]  In short[,] me and the brothers of this ummah and the Da'wah as-Salafiyyah would like for you to allow the people of this Da'wah . . . to start coming up and stop putting or trying to force your minhaj of bid'ah[6] on this ummah, for we are not benefit[t]ing.  You are not teaching tawheed[7] to the people which is a sin of bid'ah so either step down or get down with the correct minhaj.

(Doc. 115, Ex. 5 at 6.)

5.     Imam Hnesh received at least thirty-four inmate request slips that were similar to Floyd's at or around the same time.  (Doc. 115, Ex. 5.)  Nine of the request slips used nearly identical language to ask Imam Hnesh to "step down from [his] position."  (Id.)

---

[2] The phrase "Da'wah as-Salafiyyah" means the call of the Salafi faith. (Doc. 116 at 68.)

[3] The word "Ash-Shaytaan" means Satan.  (Doc. 116 at 69.)

[4] The word "ummah" means the community of believers in the Salafi faith. (Doc. 116 at 69-70.)

[5] The word "minhaj" means a methodology.  (Doc. 116 at 34, 70.)

[6] The word "bid'ah" means innovative religious instruction, a concept which the Salafi faith views as misguided.  (Doc. 116 at 72.)

[7] The word "tawheed" means "oneness of God" or monotheism.  (Doc. 116 at 72-73.)

6.      On September 5, 2002, Floyd was placed in administrative custody[8]

pending an investigation into whether the filing of the thirty-five inmate request

slips constituted unauthorized group activity in contravention of prison policy.

(Doc. 32 ¶ 13; Doc. 73 ¶ 13.)

7.      On September 12, 2002, defendant Intelligence Captain Vincent F.

Mooney ("Captain Mooney")[9] requested a ten-day extension of Floyd's

administrative custody based upon the time-consuming nature of the unauthorized

group activity investigation.  The request was approved by defendant

Superintendent Edward J. Klem ("Superintendent Klem").[10]  (Doc. 32 ¶ 14; Doc. 73

¶ 14; Doc. 114, Ex. 3.)

8.      On September 17, 2002, Floyd filed an inmate request slip that was

addressed to Superintendent Klem and that sought clarification of the reason for

---

[8]  Administrative custody is segregated housing that is imposed for various non-disciplinary reasons, such as conducting a medical or psychological examination of an inmate, preventing an inmate from posing a danger to himself or others, or permitting an investigation into an inmate's conduct.  (Doc. 116 at 239-40.)  Inmates in administrative custody are provided certain privileges, such as telephone access and visitation, that inmates in disciplinary custody are not.  (Id. at 241.)

[9]  Since the occurrence of the events underlying this lawsuit, Mooney has been promoted to Major of Unit Management at SCI-Dallas.  He has been employed by the Department of Corrections for a total of twenty-two years.  (Doc. 116 at 159-60.)

[10]  Klem had been the Superintendent of SCI-Mahanoy since June of 2002.  (Doc. 116 at 133-34.)  He has been employed by the Department of Corrections for a total of thirty-six years.  (Id. at 248-49.)

his confinement.  (Doc. 32 ¶ 15; Doc. 73 ¶ 15; Doc. 114, Ex. 4.)  The request slip

provides, in pertinent part, as follows:

> I write for answers and clarification for the following.  I have been placed in the [Restricted Housing Unit] under invest[i]gation for violating Rule DC-ADM 802 . . . .  Now it is from my understanding that for me to be held over ten days, you have to give the go ahead, which it seems you have because I am now on my 12th day.  So my question to you is, how did I v[i]olate such rule by submitting an indivi[d]ual request stating my opi[nio]n and beliefs from a religious standpoint to a religious chapl[ai]n as I was instructed to by him . . . which was well within my right of freedom of speech when no other inmate signed my request nor did I sign another inmate[']s request.  With this said, what I need you to clarify for me is what are the grounds for one to v[i]olate said rule because what I did was no doubt an indivi[d]ual act and in no way a "group activit[y]." . . . .

(Doc. 114, Ex. 4.)  Deputy Superintendent Novotney responded by informing Floyd

that his "continued placement" was "permitted by policy."  Novotney then

forwarded the request to the security office and provided copies to Captain Mooney

and Superintendent Klem.  (Id.)

9.     Captain Mooney oversaw an investigation that revealed that Floyd was a

member of an "extremely sophisticated" organization of inmates.  The group of

inmates communicated with one another in code, sent literature and other items

out of the prison in other inmates' names, and received volumes of religious texts

from unauthorized sources.  The investigation also revealed that Floyd was a major

player in the inmate organization.  (See Doc. 116 at 170-73.)

10.     On September 20, 2002, Floyd received misconduct number 427695, which

charged him with engaging in or encouraging unauthorized group activity by filing

an inmate request slip contemporaneously with thirty-four other Salafi inmates.

(Doc. 32 ¶ 16; Doc. 73 ¶ 16.)  The misconduct was authored by Captain Mooney and states, in pertinent part, as follows:

> On 8/28/02 Imam Henesh [sic] received numerous request slips requesting he allow members of a Germantown mosque into SCI-Mahanoy to teach the beliefs of the Salafee.  The request slips also requested that Imam Henesh [sic] step down if he did not honor their request.  All the request slips were received on the same day, contained the same information and appeared to be written by a few individuals.  During an interview with Floyd, [he] admitted that he wrote a request slip and that he was the con[n]ection to the Germantown mosque.  He stated that he is a member of the mosque.  [H]e joined after being released from prison in 1999.  In his request slip, he wrote to Imam Henesh [sic] "so either step down or get down with the correct minhaj."

(Doc. 114, Ex. 5.)  Following a hearing on September 30, 2002, misconduct number 427695 was dismissed by Hearing Examiner J.K. Kane without prejudice to Captain Mooney's right to rewrite the misconduct "with more documentation and/or other charges."  (Doc. 114 Ex. 6; Doc. 32 ¶ 17; Doc. 73 ¶ 17.)  Floyd was ordered to remain in administrative custody pending re-issuance of the misconduct.  (Doc. 32 ¶ 17; Doc. 73 ¶ 17.)

     11.    On October 2, 2002, Floyd received misconduct number 432265, which charged him with engaging in or encouraging unauthorized group activity and with threatening another person, namely, defendant Hnesh.  The misconduct was again authored by Captain Mooney and its text was nearly identical to that contained in

the previous misconduct.[11]  (Doc. 32 ¶ 18; Doc. 73 ¶ 18; Doc. 114, Ex. 8.)  On October

4, 2002, Hearing Examiner Kane dismissed without prejudice the charge of

threatening another person but found Floyd guilty of engaging in or encouraging

unauthorized group activity.  (Doc. 114, Ex. 9; Doc. 32 ¶ 19; Doc. 73 ¶ 19.)  Hearing

Examiner Kane sentenced Floyd to ninety days in disciplinary custody[12] and, in

support of this sentence, stated the following:

> Floyd states essentially in [the] attached version that he did write a request
> slip to the Iman [sic] requesting him to allow other people in to teach and if
> not, for him to step down.  When showed the request slip in question, he
> admitted to authoring it.  He claims he never wrote one for any other inmates
> and never encouraged anyone to write, but he did have knowledge of other
> inmates[] dissatisfied with things the way the Iman [sic] was running them.
> He then tells me when he did this[,] he was only in the jail three weeks.
>
> I find for the officers['] report over the inmate['s] denial that he did engage in
> an unauthorized group activity i[n] submit[ting] a request slip, along with
> numerous other inmates, requesting the Iman [sic] step down if their
> demands were not met.  Floyd['s] statement of only being here for three
> weeks leads me to also find he was more likely than no[t] encouraged to do
> this, giving his stated lack of time in this jail.  I find him guilty of the charge
> engaging in or [e]ncouraging unauthorized group activity.

(Doc. 114, Ex. 9.)

--------------------------------------------------------------------------------

[11]  The third sentence in the original misconduct was replaced with the
following:

> All of the request slips were received on the same day and contained the
> same demands.  Based upon these facts, it appears to be a coordinated effort
> making Floyd's actions part of an unauthorized group activity to have the
> Imam step down.

(Doc. 114, Ex. 8.)

[12]  Disciplinary custody is a type of corrective custody that is imposed upon
inmates for rule infractions.  (Doc. 116 at 239.)

12.     On October 16, 2002, Floyd appealed his sentence to the Program Review

Committee ("PRC"),[13] which sustained the hearing examiner's decision on October

24, 2002.  (Doc. 32 ¶¶ 20, 22; Doc. 73 ¶¶ 20, 22.)  On November 5, 2002, Floyd

appealed the PRC's decision to Superintendent Klem, citing procedural violations

committed by the hearing examiner and alleging that the evidence was insufficient

to support the hearing examiner's decision.  Specifically, Floyd alleged that Imam

Hnesh had solicited inmate request slips and that Captain Mooney was violating his

rights by pursuing the misconducts.  Superintendent Klem[14] sustained the hearing

examiner's decision on November 8, 2002, reasoning as follows:

> At the time of your misconduct hearing, it was admitted that you did write a
> request slip to the [Imam] requesting him to allow people [in to] teach and if
> not, he should step down as the Imam.
>
> This request slip was remarkably identical to other request slips received at
> the time making the same communication and clearly part of a coordinating
> effort.
>
> Upon review of all of the information available, it is clear that there was
> sufficient evidence to support the finding of guilt.  Additionally, no
> procedural violations are evident.  The findings and sanction of the Hearing
> Examiner are therefore sustained.  Your appeal to my office is denied.

(Doc. 32 ¶¶ 23-24; Doc. 73 ¶¶ 23-24; Doc. 114, Exs. 14, 15.)  Floyd then appealed to the

chief hearing examiner who also sustained the decision.  (Doc. 116 at 45.)

---

[13]  The PRC is a panel of three prison staff members that oversees inmates in
administrative and disciplinary custody and conducts periodic reviews of their
situations every ninety days.  The PRC also represents the first level of appellate
review from disciplinary decisions.  (Doc. 116 at 238.)

[14]  The decision denying the appeal was signed by Deputy Superintendent
Novotney on behalf of Superintendent Klem.  (Doc. 114, Ex. 15.)

13.     On November 27, 2002, the PRC conducted a periodic review of Floyd's confinement status.[15]   The PRC's report stated that Floyd had exhibited "good conduct" during his time in confinement and that he was "respectful and responsive" during the periodic review.   The PRC advised Floyd that "[a]ny continued inappropriate activity regarding this misconduct would result in his return placement" in restricted housing and that he should "avoid any inappropriate or negative activity."   Floyd promised to comply with these instructions.   The PRC concluded that Floyd should be released into general population at the expiration of his ninety day sentence on December 3, 2002. Superintendent Klem reviewed and approved this decision.   (Doc. 114, Ex. 16.)

14.     On December 3, 2002, Floyd was placed on administrative custody status pending the PRC's final review of the propriety of his release into general population.   (Doc. 32 ¶ 25; Doc. 73 ¶ 25.)   On December 5, 2002, the PRC concluded that Floyd posed a threat to prison security and should remain in administrative custody.[16]   The PRC's rationale provides, in pertinent part, as follows:

---

[15]   The PRC was composed of Deputy Superintendent Novotney, J.E. Unell, and K.G. Chmielewski.   (Doc. 114, Ex. 16.)

[16]   The PRC was composed of J.A. Michaels, J.E. Unell, and E.M. Kneiss. (Doc. 114, Ex. 18.)

Floyd was involved in a subversive group trying to discredit the Imam and have him removed from this institution. The Security Office had done an investigation and locked a group of inmates up. It was advised that somebody would be transferred and others would remain. Those who were to remain[] were scheduled for release last week, however, Deputy Kneiss had some concerns about their inappropriate actions and was not on PRC the previous week. Therefore, he had them confined and Administrative Custody hearings were held this day.

Floyd was asked what can be expected of him if he was released to general population to which he responded that his ideas have not changed, some technical rules that were brought to his attention he would avoid, however, his thoughts as a Muslim and his thoughts of getting rid of the Imam were not going to change. PRC found this to be an unhealthy situation for this institution and felt that it would be appropriate for him to remain in the RHU to give him some time to think about what he believes and what should be appropriate for the possible disruption of this institution. He is seen as a threat and will be continued on Administrative Custody status effective this date.

(Doc. 114, Ex. 18.) Superintendent Klem reviewed and approved this decision. (Id.)

15.    On December 10, 2002, Floyd appealed to Superintendent Klem, who sustained the PRC's decision on December 11, 2002. Floyd then appealed to the chief hearing examiner, who also sustained the decision. (Doc. 32 ¶¶ 27-29, 32; Doc. 73 ¶¶ 27-29, 32.)

16.    On December 17, 2002, Floyd filed an inmate request slip addressed to Superintendent Klem. The request slip states, in pertinent part, as follows:

The PRC has stated that "they felt that it would be appropriate for me to remain in the RHU to give me some time to think about what I believe." I have been in the RHU for over 90 days which is more th[a]n enough time to think about anything and my beliefs are clear. [I]s it that the PRC wants me to change them [my beliefs]? And how long will I be confined to the RHU[?]

10

(Doc. 114, Ex. 22.)  Apparently responding to Floyd's second question only,

Superintendent Klem stated that he would "be guided by [Floyd's] reports and the

recommendations of the PRC."  (Id.; see also Doc. 32 ¶ 29; Doc. 73 ¶ 29.)

17.    On February 27, 2003, the PRC conducted a periodic review of Floyd's

confinement status.[17]  The PRC's report stated that Floyd had exhibited "very good

conduct" during his time in confinement and that he was "respectful and

responsive" during the periodic review.  The PRC's decision states, in pertinent

part, as follows:

> PRC notes that Floyd was involved in a subversive group, was trying to
> discredit the Imam and have him removed from this institution.
>
> . . . Floyd maintained that he had no problem with the Imam and that he
> learned his lesson.  Floyd promised to behave himself and get himself
> involved in programs if he were to be released to population.  PRC discussed
> his situation with the Imam.  After reviewing the total situation, PRC's
> decision is to release Floyd to population.  Floyd was advised that he will be
> watched very closely and would be returned to the [Restricted Housing Unit]
> very quickly if he displayed any inappropriate conduct or behavior.  Floyd
> said he understood.
>
> PRC's decision is to release Floyd to population today, 2/27/03, as there is no
> reason identified to have him remain in the RHU.

(Doc. 114, Ex. 24.)  Superintendent Klem reviewed and approved this decision.  (Id.)

18.    Floyd was returned to general population after spending a total of 175

days in administrative and disciplinary custody.  (Doc. 116 at 52.)

---

[17]  The PRC was composed of J.A. Michaels, J.E. Unell, and K.G.
Chmielewski.  (Doc. 114, Ex. 24.)

## II. **Discussion**

Section 1983 of Title 42 of the United States Code offers private citizens a

means to redress violations of federal law committed by state officials.  See

42 U.S.C. § 1983.  The statute provides, in pertinent part, as follows:

> Every person who, under color of any statute, ordinance, regulation,
> custom, or usage, of any State or Territory or the District of Columbia,
> subjects, or causes to be subjected, any citizen of the United States or
> other person within the jurisdiction thereof to the deprivation of any
> rights, privileges, or immunities secured by the Constitution and laws,
> shall be liable to the party injured in an action at law, suit in equity, or
> other proper proceeding for redress . . . .

Id.  Section 1983 is not a source of substantive rights, but merely a method for

vindicating violations of other federal laws.  Gonzaga Univ. v. Doe, 536 U.S. 273,

284-85 (2002); Kneipp v. Tedder, 95 F.3d 1199, 1204 (3d Cir. 1996).  To establish a

claim under this section, the plaintiff must show a deprivation of a "right secured

by the Constitution and the laws of the United States . . . by a person acting under

color of state law."[18]  Id. (quoting Mark v. Borough of Hatboro, 51 F.3d 1137, 1141

(3d Cir. 1995)).

---

[18] Defendants do not dispute that they were acting under color of state law at
all times relevant to the instant action.

In the instant case, Floyd asserts only one § 1983 claim, namely, that defendants retaliated against him in violation of his First Amendment rights.[19]  In order to establish a prima facie case of retaliation under the First Amendment, a prisoner-plaintiff must prove:  (1) conduct or speech protected by the First Amendment, (2) a retaliatory action by prison officials sufficient to deter a person of ordinary firmness from exercising his First Amendment rights, and (3) a causal link between the constitutionally protected conduct or speech and the retaliatory action.  Thomas v. Independence Twp., 463 F.3d 285, 296 (2006); see also, e.g., Eichenlaub v. Twp. of Indiana, 385 F.3d 274, 282 (3d Cir. 2004); Rauser v. Horn, 241 F.3d 330, 333 (3d Cir. 2001).  Once a prisoner has made such a prima facie showing, the burden shifts to the defendant to prove by a preponderance of the evidence that he or she "would have made the same decision absent the protected conduct for reasons reasonably related to a penological interest."  Rauser, 241 F.3d at 333-34.  In applying this framework to a prisoner case, the court must "recognize that the task of prison administration is difficult" and should "afford deference to decisions made by prison officials who possess the necessary expertise."  Id. at 334.

In the action *sub judice*, Floyd satisfies the protected activity requirement by reliance upon the filing of his request for religious accommodation.  See Lindsay v.

---

[19]  The court notes that "[a] prisoner does not relinquish First Amendment rights the moment he sets foot in the institution, but the rights are diminished in the prison environment, where resolution of constitutional claims requires the consideration of legitimate penological interests."  See Brooks v. Smith, No. 04-2680, 2007 WL 3275266, at *8 (M.D. Pa. Nov. 6, 2007) (citing Milhouse v. Carlson, 652 F.2d 371, 373 (3d Cir. 1981) and Cooper v. Tard, 855 F.2d 125, 128 (3d Cir. 1988)).

Chesney, 179 F. App'x 867, 869 (3d Cir. 2006) (finding that a prisoner has "a constitutional right to ask for religious accommodations").  Moreover, defendants concede that Floyd's placement in administrative confinement is an action that would be sufficient to deter a person of ordinary firmness from exercising his First Amendment rights.  (See Doc. 102 at 4); see also Allah v. Seiverling, 229 F.3d 200, 225 (3d Cir. 2000) (noting the possibility that "in some cases placement in administrative segregation would not deter a prisoner of ordinary firmness from exercising his or her First Amendment rights," but holding that a factfinder could determine that such segregation was a retaliatory action); Thaddeus-X v. Blatter, 175 F.3d 378, 396 (6th Cir. 1999) ("In the prison context, an action comparable to transfer to administrative segregation would certainly be adverse.").

To establish the causation element of a retaliation claim, a plaintiff must prove that his or her participation in a protected activity "played some substantial role" in motivating the retaliatory action.  Meenan v. Harrison, Civ A. No. 3:03-CV-1300, 2006 WL 1000032, at *4 (M.D. Pa. Apr. 13, 2006); see also Brooks v. Smith, No. 04-2680, 2007 WL 3275266, at *8 (M.D. Pa. Nov. 6, 2007).  The temporal proximity of a retaliatory action to a plaintiff's involvement in protected activity is probative of the causation element of a retaliation claim.  Estate of Smith v. Marasco, 318 F.3d 497, 512 (3d Cir. 2003); Rauser, 241 F.3d at 334.  In the action *sub judice*, Floyd's request slip dated August 28, 2002 was followed by an alleged retaliatory action on September 5, 2002.  Hence, the difference in time between Floyd's protected activity and the corresponding retaliatory action is a mere eight days.  The court finds that

this brief interval of time is suggestive of causation. <u>See</u> <u>Brooks</u>, 2007 WL 3275266, at *12 (finding an interval of "a few weeks" between a protected activity and an adverse action to be sufficient to establish causation). Moreover, Floyd's filing of the request slip was clearly a but-for cause of his confinement because it revealed to SCI-Mahanoy officials the presence of unauthorized group activity within the institution. Accordingly, Floyd has established the requisite causal link between his request slip and his administrative confinement.

Having made these preliminary findings, the court turns to the central issue presented by the instant case, namely, whether defendants have met their burden to prove by a preponderance of the evidence that they would have made the same decision absent Floyd's protected conduct for reasons "reasonably related to a penological interest." <u>See</u> <u>Rauser</u>, 241 F.3d at 333-34. The court finds that defendants have satisfied this burden. Floyd's punishment was motivated not by a desire to retaliate against him on the basis of the filing of his *single* request slip but by a desire to prevent the unauthorized group activity that was revealed to defendants by the striking similarity of the *thirty-five* request slips. <u>See</u> <u>Carter v. McGrady</u>, 292 F.3d 152, 158 (3d Cir. 2002) ("[The plaintiff] was never charged with misconduct for helping other inmates with legal matters or having their legal materials in his cell. Rather, he was charged with misconduct for undisputed violations of prison policy."). The Third Circuit has repeatedly held that protecting "the safety and stability of the institution" is a legitimate penological interest, <u>see, e.g.,</u> <u>Davis v. Pennsylvania</u>, 244 F. App'x 445, 447 (3d Cir. 2007), and that

unauthorized group activity by inmates constitutes a significant threat to institutional safety and stability, see, e.g., Cooper v. Tard, 855 F.2d 125, 129 (3d Cir. 1988) (stating that preventing inmates from creating "a leadership structure within the prison alternative to that provided by the lawful authorities" was a legitimate penological interest); The Holy Name Society v. Horn, No. 97-804, 2001 WL 959408, at *9 (E.D. Pa. Aug. 21, 2001) (noting the "inherent security problems of large inmate gatherings").[20]  Accordingly, ferreting out and punishing unauthorized group activity serves a legitimate penological interest.  That the unauthorized group activity was revealed to prison officials in the form of a request slip in the instant case is of no moment.  Unauthorized group activity would be punished in the same manner no matter its origin.

---

[20]  The risks inherent in unauthorized group activity have been succinctly stated by the District Court for the Eastern District of Wisconsin as follows:

> [T]he regulations limiting unauthorized group activity are intended to prevent inmate groups from functioning as gangs, from engaging in organized disruptions or criminal activities within the prison, from engaging in organized violations of the prison rules and regulations and from challenging the authority of the prison and its officials.  The legitimacy of the goal of eliminating prison gangs and maintaining order within the institution cannot seriously be debated. Organized gang activity is detrimental to the security, order and discipline that must be maintained within a correctional institution.  Thus, I find that the interest underlying the regulations at issue-preventing gang activity and maintaining order in the prison population-are legitimate penological objectives.

Akbar v. Borgen, 796 F. Supp. 1181, 1187 (E.D. Wis. 1992) (internal citations omitted).

Moreover, the evidence of Floyd's participation in unauthorized group activity was compelling.  Thirty-five request slips seeking nearly identical relief were received almost simultaneously.  All thirty-five slips were addressed to Imam Hnesh, and most asked Imam Hnesh to step down in a potentially threatening manner.  A later investigation confirmed the suspicion of prison officials and revealed an extremely sophisticated inmate organization that was able to contravene prison policies by sending and receiving unauthorized mail.  The investigation also revealed that Floyd served a leadership role within the covert organization.  Given this "quantum of evidence" that Floyd had engaged in unauthorized group activity, the court cannot now conclude that the prison officials' conduct was motivated by anything other than a desire to maintain institutional order.  See Carter, 292 F.3d at 159 ("Given the quantum of evidence of Carter's misconduct, we cannot say that the prison officials' decision to discipline Carter for his violations of prison policy was not within the "broad discretion" that we must afford them.").  It is not this court's function to second-guess the rational decision of prison officials that Floyd's transfer to administrative custody served the legitimate penological interest of maintaining safety and security within the institution.  See Ebersole v. Pennsylvania, No. 01-1924, 2007 WL 2815730, at *7 (M.D. Pa. Sept. 25, 2007) (finding that the decision of prison officials that the plaintiff presented "a legitimate risk of fraternization between inmates and staff" would not be overturned); see also The Holy Name Society, 2001 WL 959408, at *7

(noting that "courts are ill equipped to deal with the increasingly urgent problems
of prison administration").

The court's conclusion is bolstered by the Third Circuit's decision in <u>Lindsay</u>
<u>v. Chesney</u>, 179 F. App'x 867 (3d Cir. 2006).  In <u>Lindsay</u>, the plaintiff filed a religious
accommodation request form which complained that Nation of Islam adherents
were being excluded from Islamic religious services.  Thereafter, he was placed in
administrative custody pending an investigation regarding whether he had
participated in unauthorized group activity.  The defendants averred that the
plaintiff had congregated in prison areas with several other members of the Nation
of Islam and that prevention of such activity provided the "legitimate penological
interest" for their actions.  <u>Id.</u> at 868-70.  The court held that the plaintiff's
retaliation claim failed because the defendants had "established that they would
have made the same decisions absent [the plaintiff's] filing the accommodations
request for reasons reasonably related to a legitimate penological interest which,
here would be crime deterrence and institutional security."  <u>Id.</u> at 870 (quoting
<u>Rauser</u>, 241 F.3d at 334).  In so holding, the court noted that the plaintiff's "right to
engage in religious activity is not so broad as to encompass an unlimited right to
engage in whatever unauthorized group [activities] he wishes."  <u>Id.</u> at 869; <u>see also</u>
<u>Jones v. N.C. Prisoners' Labor Union, Inc.</u>, 433 U.S. 119, 132 (1977) (holding that
First Amendment associational rights could be "curtailed whenever the
institution's officials, in the exercise of their informed discretion, reasonably
conclude that such associations, whether through group meetings or otherwise,

18

possess the likelihood of disruption to prison order or stability, or otherwise interfere with the legitimate penological objectives of the prison environment").

Similarly, in the instant case, Floyd's First Amendment rights are not so broad as to insulate him from punishment for his participation in unauthorized group activity. Were the court to hold otherwise, prison officials would be prohibited from pursuing threats to institutional security simply because such threats were revealed simultaneously with protected activity. The exigencies of the prison environment necessitate that prison officials be permitted to respond to institutional threats in any reasonable manner that they deem appropriate under the circumstances. Any interpretation of constitutional principles that would prohibit them from doing so is clearly contrary to sound public policy.

Accordingly, defendants have satisfied their burden to prove by a preponderance of the evidence that their actions were motivated not by Floyd's protected conduct but by a legitimate penological interest. Judgment on the First Amendment retaliation claim will be entered in favor of defendants.[21]

---

[21] To the extent that Floyd contends that the duration of his confinement in administrative custody was motivated by his protected activity, the court finds no merit to this contention. The length of Floyd's confinement was based upon the PRC's reasonable determination that Floyd continued to pose a threat to institutional security because his desire to unseat Imam Hnesh had not changed. (See Doc. 114, Ex. 18 (stating that Floyd testified that "his thoughts of getting rid of the Imam were not going to change")). Preventing such a threat to Imam Hnesh certainly serves a legitimate penological interest.

III.    **Conclusions of Law**

1.   Plaintiff has proven by a preponderance of the evidence the elements necessary to establish a prima facie case of First Amendment retaliation.

2.   However, defendants have met their burden to prove by a preponderance of the evidence that they would have taken the same adverse action absent Floyd's protected conduct to serve a legitimate penological interest.

3.   Judgment should be entered against plaintiff and in favor of defendants on plaintiff's First Amendment retaliation claim.

An appropriate order will issue.


 S/ Christopher C. Conner
CHRISTOPHER C. CONNER
United States District Judge


Dated:    August 20, 2008

**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **ERIC FLOYD,** | : | **CIVIL ACTION NO. 1:03-CV-1795** |
| | : | |
| **Plaintiff** | : | **(Judge Conner)** |
| | : | |
| **v.** | : | |
| | : | |
| **EDWARD J. KLEM, VINCENT F.** | : | |
| **MOONEY, and ABDEL HAMID** | : | |
| **HNESH,** | : | |
| | : | |
| **Defendants** | : | |

## ORDER

AND NOW, this 20th day of August, 2008, upon consideration of the amended

complaint (Doc. 32), and following a bench trial, and for the reasons set forth in the

accompanying memorandum, it is hereby ORDERED that the Clerk of Court is

directed to enter JUDGMENT in favor of defendants and against plaintiff and to

CLOSE the above-captioned case.


  S/ Christopher C. Conner
CHRISTOPHER C. CONNER
United States District Judge